William Duane **ELLEDGE**,
Petitioner-Appellant,

v.

Richard L. **DUGGER**,
Respondent-Appellee.

No. 86–5120.

United States Court of Appeals,
Eleventh Circuit.

July 20, 1987.

---

Richard L. Jorandby, Public Defender, Craig S. Barnard, Chief Asst. Public Defender, West Palm Beach, Fla., Richard H. Burr, III, New York City, for petitioner-appellant.

Robert A. Butterworth, Atty. Gen., Robert L. Bogen and Richard Bartmon, Asst. Attys. Gen., West Palm Beach, Fla., for respondent-appellee.

Before RONEY, Chief Judge, and HATCHETT and EDMONDSON, Circuit Judges.

PER CURIAM:

Defendant-petitioner William Duane Elledge appeals a district court order denying him federal habeas corpus relief; he raises six bases for relief. Because we find that Elledge has shown that his constitutional rights were violated in one respect, we vacate the district court's judgment and remand with instructions.

Elledge was involved in three killings that occurred in a 36 hour period in August, 1974,[1] although only the first murder—of Margaret Anne Strack—is at issue on appeal. Strack was raped and killed in

Hollywood, Florida, on August 24, 1974; the two subsequent murders occurred in Jacksonville, Florida. Early in the morning of August 26, 1974, Jacksonville police arrested Elledge for the third homicide. He then was interrogated four times between 4:30 a.m. and 10:30 a.m. that morning; the police properly informed Elledge of his rights· on each occasion. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During the course of their questioning and investigation, the Jacksonville police determined that Elledge was a suspect in the Strack homicide and questioned him about it as well. At the last interrogation, Elledge orally confessed to all three murders. The next day he again confessed to the Strack murder after follow-up interrogation by Hollywood police investigators; this confession was tape recorded.

Elledge's public defender adopted the following strategy: (1) plead insanity if possible; (2) if that defense was not available, suppress the confession and plead not guilty; and (3) if the confession could not be suppressed, plead guilty and seek mercy. The insanity defense proved fruitless when psychiatrists found Elledge to be sane; efforts to suppress the confessions on the grounds that Elledge was physically coerced because he confessed without sleep or food and was still under the influence of drugs and alcohol also failed. Under advice of counsel, Elledge then entered a plea of guilty, leaving sentencing as the sole issue to be determined.

Although a sentence of death was entered after the first sentencing hearing (in 1975), the Florida Supreme Court overturned that sentence and remanded the case for a new sentencing hearing. *Elledge v. State*, 346 So.2d 998 (Fla.1977). The same state trial judge presided over the second sentencing hearing; he appointed the same attorney, who by this time was in private practice, to represent Elledge. This second sentencing hearing, held in

---

**1.** The facts and details of this crime spree are set forth in *Elledge v. State*, 346 So.2d 998 (Fla. 1977).

1977, is the sentencing hearing referred to in the balance of this opinion.

Elledge's taped confession was played at the sentencing hearing; additionally, a variety of witnesses testified. Defendant took the stand in his own behalf and detailed his harsh childhood and early addiction to and abuse of alcohol and drugs. A jury considered the evidence and recommended death; the judge agreed and, thus, entered a sentence of death. A series of unsuccessful state appeals followed.[2] After exhausting all state remedies, Elledge filed a petition for a writ of habeas corpus with the United States District Court for the Southern District of Florida. That court held an evidentiary hearing and concluded that, while counsel's performance at the sentencing hearing was inadequate, no prejudice resulted from counsel's unreasonable performance. The district court then denied the petition, and this appeal followed.

Elledge makes these contentions on appeal: (a) counsel's performance in challenging the confession was inadequate and prejudiced Elledge; (b) the district court's conclusion that no prejudice arose from counsel's inadequate representation at the sentencing phase was erroneous because the court failed to consider that the evidence not adduced would have altered the entire evidentiary picture; (c) Elledge did not receive an individualized capital sentencing determination because the trial judge refused to consider any nonstatutory factors that mitigated against imposing the death penalty; (d) the death penalty was applied mechanistically under Florida's felony murder rule without regard for whether Elledge intended that a life would be taken; (e) the death penalty is applied in an arbitrary and discriminatory manner in Florida as evidenced by empirical studies that indicate a disproportionality in death sentences based on the race and/or sex of the victim;

and (f) the trial court's decision to shackle Elledge at the sentencing hearing was inherently prejudicial.

I. *Effectiveness of Representation in Seeking to Suppress the Confessions.*

As a threshold matter, effective assistance of counsel is a two-prong issue. The petitioner must establish both that counsel's performance was not reasonably adequate and that petitioner was prejudiced by that unreasonable performance to the point that he did not receive a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Elledge's basic claim is that his counsel was ineffective because he failed to use the proper theory in challenging the confessions. The two confessions require different analytic frameworks; therefore, we will discuss each separately.

A. The first, untaped confession

Elledge's counsel sought to suppress the first confession, arguing that it was involuntary because it was physically coerced. Counsel maintained that Elledge had no sleep the night of his arrest and interrogation, had no food and drink during his interrogation, confessed while hung over and under the residual impact of drugs and alcohol, and was in a general "daze" at the time of his confession.[3] Counsel did not argue, however, that Elledge's fifth amendment rights were violated when the police repeatedly reinterrogated and rewarned him of his *Miranda* rights despite Elledge's alleged invocation of his right to silence. This omission was unreasonable representation according to Elledge. We disagree.

The test for the performance prong of *Strickland* is objective "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. A reviewing court conducting such an ex-

---

**2.** The Florida Supreme Court affirmed Elledge's death sentence. *Elledge v. State,* 408 So.2d 1021 (Fla.1981), *cert. denied,* 459 U.S. 981, 103 S.Ct. 316, 74 L.Ed.2d 293 (1982). Elledge then sought and was denied collateral relief pursuant to Fla.R.Crim.P. Rule 3.850. The Florida Supreme Court affirmed. *Elledge v. Graham,* 432 So.2d

35 (Fla.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 368 (1983).

**3.** Elledge maintains that this daze was the result of three people dying in such a short period of time.

amination must view the performance at the time it occurred, avoid the "distorting effects of hindsight," *id.*, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2066, 80 L.Ed.2d at 694.

Until *Michigan v. Mosley,* 423 U.S. 96, 102–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320–22 (Dec. 9, 1975), repeated reinterrogation in conjunction with repeated *Miranda* warnings was not recognized as a potentially coercive technique. Elledge's counsel sought to suppress the first confession in March, 1975; obviously, he did not have the benefit of *Mosley* at that time. Furthermore, as of March, 1975, no Florida courts had held that such procedures were coercive. Reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop. *See Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.), *aff'd,* 464 U.S. 109, 104 S.Ct. 450, 78 L.Ed.2d 266 (1983) (per curiam). Thus, Elledge's claim fails on the first, performance prong of *Strickland.*

#### B. The second, taped confession

Even if we assume, arguendo, that counsel's performance was unreasonable because he did not attack the police's alleged failure to honor Elledge's invocation of his right to remain silent,[4] we find that no prejudice attached as a result, because the second confession was admissible—under either of two alternative grounds—even if the first confession was not.

A confession that follows on the heels of an involuntary confession may be tainted thereby and thus inadmissible. *See Martin v. Wainwright,* 770 F.2d 918, 928 (11th Cir.1985), *modified on other*

grounds, 781 F.2d 185 (11th Cir.1986). The taint transfers, however, only if the first confession was inadmissible as involuntary, *i.e.,* coerced and not the product of a free will. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222, 231 (1985); *Martin,* 770 F.2d at 928. This circuit has held that not honoring a request to stop questioning is no different from failing to give the *Miranda* warning in the first place; while both are "technical" violations of *Miranda,* neither violates the fifth amendment. *Martin,* 770 F.2d at 928–29 (relying on *Elstad,* 470 U.S. at 308, 105 S.Ct. at 1293, 84 L.Ed.2d at 231). Thus, confessions obtained by such violations, while inadmissible because they run afoul of *Miranda*'s per se bar, are not "involuntary"[5] and do not taint any subsequent confessions. *Id.* Therefore, the second, taped confession was not made inadmissible even if the first confession resulted from technical *Miranda* violations.

Furthermore, even if the first confession was both violative of *Miranda and* involuntary, Elledge cannot prove he was prejudiced by admission of the second confession because it was sufficiently distinct from the first confession and, therefore, admissible. *See Elstad,* 470 U.S. at 309, 105 S.Ct. at 1294, 84 L.Ed.2d at 232–33 (dicta). When an earlier confession has been coerced and, thus, was involuntary, a court seeking to determine whether a subsequent confession is tainted thereby must look to "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.; see Holleman v. Duckworth,* 700 F.2d 391, 396 (7th Cir.1983); *United States v. Gresham,* 585 F.2d 103, 108 (5th Cir.1978).[6]

In Elledge's case, a full day had passed between the confessions; he had

---

4. Elledge now contends that the police repeatedly reinterrogated him—albeit after warning him of his *Miranda* rights on each occasion—after only short periods of time had passed.

5. Whether a statement is "voluntary" requires application of pre-*Miranda* due process voluntariness analysis. *Martin,* 770 F.2d at 928. That is, the court must look at all the circum-

stances to determine whether the confession was made of the accused's free will. *Id.* at 925.

6. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

slept and eaten; new interrogators were employed (although his original interrogator was present for part of the new questioning); and the interrogation occurred in entirely different and comfortable surroundings. Additionally, his inquisitors did not use the first confession as leverage to coerce the second. *See Gresham,* 585 F.2d at 108.

Consequently, if counsel had succeeded in suppressing the first confession by means of a *Mosley* -type attack, the second confession nevertheless would have been admissible. Therefore, even were we to assume that counsel's failure to adopt such a strategy rendered his performance unreasonable, Elledge cannot demonstrate that any prejudice inhered as a result. Counsel's performance thus was not ineffective under *Strickland.*

## II. *Effectiveness of Representation at the Sentencing Hearing* [7]

The district court held an evidentiary hearing and concluded that Elledge's counsel rendered unreasonable assistance at the sentencing phase because he failed to investigate and to present a psychiatric mitigating defense based on his client's mental deficiencies, abject childhood and history of drug and alcohol abuse. That court nevertheless determined that counsel was not ineffective because the failure did not prejudice Elledge: he would have received the

same sentence even had such evidence been adduced. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. Because these conclusions are subject to plenary review by this court,[8] *id.* at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700, we shall discuss each separately.

### A. Performance

As discussed earlier, the first prong in an ineffective assistance claim is whether counsel's performance was professionally unreasonable. A reviewing court, however, must be highly deferential in scrutinizing counsel's performance; the tendency and temptation to second-guess is high and must be avoided. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Thus, we look to the particular facts of the case and determine whether the acts or omissions were "outside the wide range of professionally competent assistance" to the extent that the errors caused the "adversarial testing process" not to work. *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

■ In this case, the claim is that counsel failed to investigate Elledge's past.[9] Specifically, the district court found that counsel made no effort either to locate an expert psychiatric witness or to put on background character testimony from family members in mitigation.[10] This factual

---

7. The district court considered this to be Elledge's sole claim with "arguable" merit.

8. The underlying factual findings of the district court are presumptively correct unless clearly erroneous, and the factual findings of the state court are subject to the 28 U.S.C. Sec. 2254(d) presumption of correctness.

9. *Strickland* requires only that counsel conduct a reasonable investigation or make a reasonable decision not to investigate. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 1066. Establishing what a reasonable investigation would have entailed often will be pivotal. Testimony from lawyers normally will be necessary to establish what the reasonable level and quality of investigation would be. In some extreme cases, such as where *no* investigation occurred, a judge can conclude, even in the absence of expert testimony, that the investigation—or lack thereof—was deficient. We devote little attention to this first step, in this case, because the court correctly

concluded that, under these circumstances, some investigation was required.

10. Elledge's counsel's performance was not inadequate, according to the state, since counsel was aware that an unbroken trail of psychiatric evaluation unanimously had not found Elledge to suffer from an organic brain dysfunction. Given this diagnostic history, the State claims it was a reasonable decision to conduct no investigation. Were these the sole facts presented we might agree; but other relevant facts require a different conclusion.

Elledge's counsel was convinced in 1975 that Elledge was "crazy"; he continued to hold that conviction in 1977 (*i.e.,* prior to the second sentencing hearing) despite two court-ordered psychiatric evaluations to the contrary. Counsel then discovered, in talking with Elledge, that prison authorities had been treating Elledge with Mellaril and Dilantin while he was incarcerated pending the 1977 sentencing hearing. Mellaril is an antipsychotic medication and Di-

determination is not clearly erroneous.[11] *See id.* at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700. As the court noted, "counsel presented a psychiatric defense without a psychiatrist," relying instead solely on Elledge's "free-form" testimony about his background and mental impairments.

We accept the district court's view that counsel's failure at least to interrogate Elledge's relatives and to seek an expert witness was outside the range of competent assistance. *See Tyler v. Kemp,* 755 F.2d 741, 744–45 (11th Cir.1985), *cert. denied sub nom. James v. Tyler,* 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985), *overruled in part (on other grounds), Peek v. Kemp,* 784 F.2d 1479, 1494 n. 15 (11th Cir.1986); *King v. Strickland,* 748 F.2d 1462, 1463–64 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). An attorney has a duty to undertake reasonable investigation or "to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Elledge made his counsel aware of his unhappy and abused past; yet counsel did not even interrogate Elledge's family members to ascertain the veracity of the account or their willingness to testify. He also did not seek out potentially helpful expert witnesses.

Briefly stated, counsel's total failure to investigate possible witnesses, both expert and lay, when he was aware of Elledge's past and knew that mitigation was his client's sole defense, was unprofessional performance.

**B. Prejudice**

**1. Whether a favorable psychiatrist could have been found with reasonable diligence**

The district court stated that "counsel for the respondent conceded that a psychiatrist such as Dr. Dorothy Lewis, who testified in Mr. Elledge's defense during the evidentiary hearing before this Court, could have been located in 1977 to testify during the sentencing proceeding...."[12] This led the court to conclude that counsel's performance fell below the standard set out in *Tyler v. Kemp,* 755 F.2d 741, 744–45 (11th Cir.1985).[13] The court went on to conclude, however, that even had counsel produced such a witness the death sentence nevertheless would have been imposed. Consequently, Elledge was not prejudiced; counsel was not ineffective under *Strickland;* and the sixth amendment was not violated.

Although the district court's conclusion that the sixth amendment had not been

---

lantin is an antiepileptic medication. Despite this new information, which supported his already held conviction that his client was "crazy," counsel did not seek new expert advice. Counsel's failure to pursue the issue, once its viability was renewed, was inadequate professional performance.

**11.** When a defendant informs counsel that "certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. v. 691, 104 S.Ct. at 1066. The record is not completely clear whether Elledge's counsel ever asked his client about possible testimony by family members. All indications, however, are that no such questioning occurred. Elledge did eventually imply that he did not feel his family would be particularly interested. Although the record is somewhat opaque, we feel the district court was not clearly wrong in deciding that counsel was aware that family members existed who could corroborate, and perhaps expand on, Elledge's testimony. The court also was not clearly erro-

neous in concluding that Elledge had not dissuaded counsel from undertaking an investigation to determine the willingness of such family members to testify. We note that Elledge's brother and sister later stated that had they been approached in 1977 they would have testified.

**12.** Dr. Dorothy Lewis testified in Elledge's defense at the federal habeas hearing. She found that he suffered from organic brain dysfunction, episodic rages and paranoid behavior. She also stated that in her opinion Elledge became especially violent when he felt he was teased, tricked or in danger. Her conclusion was that the combination of organic brain dysfunction, psychotic paranoia and childhood abuse caused a disorder that affected Elledge during the Strack homicide.

**13.** The court also found that the failure to present the witnesses was not a decision of trial strategy. *See Thomas v. Wainwright,* 767 F.2d 738, 744 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986).

violated is correct, the analytic framework the court used to determine that a favorable witness could have been located was inaccurate. The record reveals that the State's counsel merely acknowledged that Dr. Lewis was extant in 1977 and had formulated her clinical theories at that time. The State never conceded that a reasonably diligent investigation would have uncovered either Dr. Lewis or a similar expert who would have testified favorably at Elledge's sentencing.

Specifically, the district court concluded that, in 1977, counsel "could have located" Dr. Lewis. The test, however, is not simply whether counsel "could have located" a witness similar to the one eventually produced. Instead, the court must determine whether it is reasonably likely that a reasonable attorney, operating under the circumstances of the case and acting in a reasonably professional manner, would have located such a witness.[14]

■ In other words, *Strickland* requires only that counsel conduct a *reasonable* investigation. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 1066. To prove that he was prejudiced by counsel's failure to investigate and to produce a certain type of expert witness, a habeas petitioner must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced. If such a result was not reasonably probable, the petitioner was not prejudiced by counsel's failure to investigate. Merely proving that someone—years later—located an expert who will testify favorably is irrelevant unless the petitioner, the eventual expert, counsel or some other person can establish a reasonable likelihood that a similar expert could have been found at the pertinent time by an ordinarily competent attorney using reasonably diligent effort.[15]

In deciding whether a petitioner has met this burden a court must look to all the circumstances of the case and consider all the evidence presented.[16] *See Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. In Elledge's case, he has made no showing that it was reasonably probable that an ordinary, reasonable lawyer, operating under the time and monetary constraints Elledge's counsel faced and using reasonable diligence, would have discovered a psychiatrist who would have

**14.** In making this determination, the court must look to what constitutes a reasonable effort; i.e., what a competent attorney would have done given the constraints of time and money under the facts of the case. Merely producing Dr. Lewis, several years later, is of no moment. We note that Dr. Lewis was practicing psychiatry in New Haven, Connecticut in 1977; it strikes us as extremely doubtful that Elledge's counsel would have discovered Dr. Lewis in 1977 with a reasonably diligent investigation. We also note that Dr. Lewis neither testified that she would have come to Florida to testify in 1977 nor that she knew of anyone in Florida who shared her views at that time. We make no comment on whether a similar expert *was* reasonably discoverable—we merely hold that the record before us reveals no evidence demonstrating such a likelihood.

**15.** Simply put, the *Strickland* test requires a habeas petitioner in Elledge's position to show: (a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who

would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed. Failure to meet *any* of these steps defeats the ineffectiveness claim.

**16.** We stress that a reviewing court need not address each aspect of the *Strickland* analysis before concluding that counsel was not ineffective. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069-70. Once the court determines that a habeas petitioner cannot meet any one of the various steps, the court need go no further. *Id.* For example, a district court may simply elect not to address whether an expert was reasonably available and instead conclude that counsel was not ineffective because no prejudice inhered in that such testimony would not have affected the ultimate sentence imposed.

In this case, however, the district court addressed the "availability" issue. Although the "availability" step was not outcome determinative in this case—because the district court properly concluded that Elledge nevertheless would have received the death penalty—it is important for us to set out the proper framework for future cases where it may be.

testified as did Dr. Lewis.[17] Accordingly, Elledge cannot demonstrate that he was prejudiced by counsel's failure to investigate his mental condition and produce a favorable expert witness.

### 2. Effect of the psychiatric and family testimony on the ultimate sentence.

■ Even if Elledge's counsel had produced Dr. Lewis and Elledge's family members at the sentencing phase, we agree with the district court that Elledge was not prejudiced thereby: he nevertheless would have received the death penalty.

The value of Dr. Lewis's testimony was undercut in part by the revelation that her analysis largely relied on Elledge's recitations and had not been fully corroborated by independent follow-up investigation. In addition, the two court-appointed psychiatrists who examined Elledge each gave damaging evaluations that would have diluted Dr. Lewis's impact.[18] Moreover, much of the testimony elicited from Elledge's brother and sister could be used against him; e.g., their descriptions of his early violent temper, his sister's explanation of his alleged incestuous assault on her, his brother's description of Elledge as "a mean guy," and their emergence as normal citizens even though they had been subjected to similar abuse and neglect. The family testimony also was cumulative

to a degree since Elledge had testified to many of the particulars in question.

As a final point, the aggravating circumstances of the case were substantial. It cannot be gainsaid that the cruelty of the rape and the murder made it more difficult for Elledge to alter the final sentence by adducing mitigating circumstances. It is proper for a reviewing court, in deciding whether the additional evidence would have altered the eventual sentence, to consider the strength of the case presented against the defendant.[19] See Strickland, 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.")

Elledge nevertheless maintains that if the psychiatric mitigating circumstances had been presented and if those circumstances had been credited by the judge and jury, the "entire evidentiary picture" would have been altered. See id. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Psychiatric mitigating evidence has this potential because it may impact the causal relationship that can exist between mental illness and homicidal behavior. Thus, psychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors. See Huckaby v. State, 343 So.2d 29, 33–34 (Fla.1977), cert.

---

**17.** To prove it is reasonably probable that such an expert could have been found by a competent lawyer exercising a reasonable amount of diligence, a petitioner could present testimony from (a) members of the bar relating to the amount of investigation that is reasonable in such a situation and the ease or difficulty in finding such experts at that time, (b) psychiatrists, or other experts in the field, relating to how widely the proposed theory was accepted at the time the investigation occurred and the ease an attorney would have had in getting such experts, and (c) any other relevant testimony that would tend to demonstrate it was reasonably probable that reasonable diligence would uncover an expert similar to the one eventually located.

We emphasize that the duty is only to conduct a reasonable investigation. Counsel is not required to "shop" for a psychiatrist who will testify in a particular way. See Barfield v. Harris, 540 F.Supp. 451, 457–59 (E.D.N.C.1982), aff'd, 719 F.2d 58 (4th Cir.1983), cert. denied,

467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

**18.** Of all the several experts who examined Elledge over the years, only Dr. Lewis found him to be operating under extreme emotional or emotional disturbance caused by organic brain damage. The great weight of expert testimony clearly cut against Dr. Lewis's testimony and made it less persuasive.

**19.** We note and reject Elledge's claim that the district court misapplied Strickland when it stated that in light of the extreme aggravating circumstances of the Strack murder, "only the most convincing evidence in support of mitigating circumstances could create a reasonable probability ... that the balance of mitigating circumstances did not warrant death." This argument places far too much emphasis on one sentence in a long order; the order, taken as a whole, makes clear that the court applied the proper standard.

*denied,* 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977).

This argument fails, however, because a careful reading of the district court's order shows that the court—acting within its discretion as factfinder—gave little weight to the testimony of Dr. Lewis as well as that of Elledge's family members. The district court simply found that no significant mitigating evidence was adduced. Further, when the court weighed the value of Dr. Lewis's testimony, it found that the aggravating factors outweighed those presented in mitigation. *See, e.g., Mann v. State,* 453 So.2d 784, 785 (Fla.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985); *Adams v. State,* 412 So.2d 850, 854, 857 (Fla.1982) (three mitigating factors, including that the capital offense was committed while defendant was under the influence of extreme mental or emotional disturbance, outweighed by three aggravating circumstances), *cert. denied,* — U.S. ——, 106 S.Ct. 1506, 89 L.Ed.2d 906 (1986). There is no indication that the district court applied anything other than the "reasonable probability" standard or failed to weigh the overall impact of the evidence on the total evidentiary picture.

The foregoing discussion illustrates that Elledge has not demonstrated a reasonable probability that, if adduced at trial, the psychiatric and background evidence presented in his habeas proceeding would have caused the sentencer to conclude "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

### III. *Consideration of Nonstatutory Mitigating Circumstances*

■ Elledge asserts that he was denied the individualized sentencing determination demanded by the eighth amendment because the sentencing judge restricted his consideration solely to statutory mitigating factors. *See generally Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

The confusion in Florida law concerning the consideration of nonstatutory mitigating circumstances—confusion that lasted from 1972 to 1978—has been discussed at length by this court. *Hitchcock v. Wainwright,* 770 F.2d 1514, 1516 (11th Cir.1985) (en banc), *rev'd sub nom. Hitchcock v. Dugger,* — U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). The period of confusion, which was exacerbated by the decision in *Cooper v. State,* 336 So.2d 1133 (Fla.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977), finally was put to rest in *Songer v. State,* 365 So.2d 696 (Fla.1978), *cert. denied,* 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979), after the United States Supreme Court decided in *Lockett* that the eighth and fourteenth amendments require the sentencer to consider *all* mitigating evidence. *Hitchcock,* 770 F.2d at 1516.

Elledge, who was sentenced after *Cooper* and before *Songer,* concedes that the trial court allowed him to introduce nonstatutory mitigating evidence; he also acknowledges that his attorney did not feel precluded from presenting such evidence. Elledge maintains, however, that the trial judge did not *consider* the nonstatutory evidence that was adduced and that the jury was improperly instructed to consider only the statutorily enumerated factors.

Recently, in *Hitchcock v. Dugger,* — U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), the Supreme Court overturned a Florida-imposed death penalty, basing its decision on a somewhat similar *Lockett* claim. The sentencing proceedings in *Hitchcock* —including the judge's instruction to the jury, the arguments to the jury, and the trial court's admission of evidence of nonstatutory mitigation—resemble Elledge's proceedings.

We nevertheless find *Hitchcock* inapplicable to these facts. *Hitchcock* did not create a per se rule of reversal when the trial judge gives a particular jury instruction.[20] Instead, the Court focused on the

---

**20.** The judge's instruction in *Hitchcock* involved a statement to the jury that "the mitigating circumstances which you may consider shall be the following," followed by a listing of the statutory factors. *Hitchcock,* 107 S.Ct. at 1824. The

specific facts of the sentencing proceeding and emphasized that both the judge and the jury believed themselves to be limited to statutory mitigating factors. *See id.,* 107 S.Ct. at 1823. Although parts of the jury instructions in Elledge's case were virtually identical to those in *Hitchcock,* the trial judge in *Hitchcock,* when sentencing the defendant, indicated he considered *solely* the statutory factors: "there were insufficient mitigating circumstances *as enumerated in Fla. Statute 921.141(b)* to outweigh the aggravating circumstances." *Id.,* 107 S.Ct. at 1824 (emphasis in the original). In the case before us, there is no such statement indicating an improperly narrow focus by Elledge's trial judge.

Moreover, we have in this record an affirmative statement by the state trial judge that indicates he did not feel he was limited to the statutory mitigating factors. Specifically, in discussing whether a particular piece of evidence, which was of a nonstatutory mitigating nature, should be allowed into evidence, the judge said, "I don't think I am limited on mitigation to a specific statute." Tr. of Sentencing Proceedings, Vol. 8 at 246.

The differing factual setting presented here persuades us that *Hitchcock* is not dispositive of this case. Even assuming that the instruction to the jury was erroneous under *Hitchcock,* the sentencing jury in Florida's trifurcated capital scheme is merely advisory. The trial judge, alone, makes the ultimate decision as to sentencing in capital cases. *See Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 45 L.Ed.2d 913 (1976). When the trial judge has the proper view of the law—as is evident from the record here—and imposes sentence based not only on statutory, but also on nonstatutory, factors, the resulting sentence meets the constitutional parameters outlined in *Lockett.*

Elledge argues, however, that his trial judge's improper view of the law is demonstrated by an earlier case in which the judge who sentenced Elledge was adjudicated by the Florida Supreme Court to have held "the mistaken belief that he could not consider nonstatutory mitigating circumstances." *Jacobs v. State,* 396 So.2d 713, 718 (Fla.1981). Elledge also cites the record of a second earlier case, *State v. Rose,* which allegedly indicates that the same trial judge held an improper view. The death penalty in *Rose* eventually was overturned on other grounds. 425 So.2d 521 (Fla.1983), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985).

While this raises a concern about the trial judge's perceptions, we are unpersuaded. The two trials Elledge points to *preceded* Elledge's case; had they bracketed his trial they would be more conclusive. Additionally, the Florida Supreme Court, which reversed the trial judge for his mistaken views in *Jacobs,* was presented on appeal with the argument that the judge held that same, improper view in Elledge's trial. Although obviously aware of the possible problem—to the point of having overturned a death sentence on those grounds in *Jacobs*—the state supreme court found that the judge held no such erroneous perception in Elledge's case. We agree.

In sum, the record reflects no manifestations that the trial judge held an improper view toward nonstatutory mitigating evidence.

## IV. *The Enmund v. Florida claim*

 Elledge maintains that his death sentence violated his eighth amendment rights as articulated in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The key to his argument is an attempt to distinguish "causation" from "culpability."

Active participation in the murder vitiates the *Enmund* concerns. *Hitchcock v. Wainwright,* 745 F.2d 1332, 1340 (11th Cir. 1984), *aff'd,* 770 F.2d 1514 (11th Cir.1985) (en banc), rev'd on other grounds sub. nom., ── U.S. ──, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Drake v. Francis,* 727 F.2d 990, 997 (11th Cir.1984), *aff'd in part, rev'd in part, remanded in part (all on other grounds) sub nom. Drake v. Kemp,*

state trial judge in Elledge's case used a virtually identical instruction.

762 F.2d 1449 (11th Cir.1985) (en banc). There was no *Enmund*-type violation in this case.[21]

## V. *Disparate Application of the Death Penalty*

 Elledge argues that the death penalty is applied in an unconstitutionally discriminatory manner in Florida. He points to empirical studies which indicate that, when the victim is white, the death sentence is imposed in Florida at an aberrationally higher rate.

The Supreme Court recently rejected this same claim as based on a study of Georgia's application of the death penalty. *See McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The Court concluded that a petitioner who raises such an allegation "must prove that the decisionmakers in *his* case acted with discriminatory purpose". *Id.,* 107 S.Ct. at 1766 (emphasis in original). Elledge's claim cannot pass this scrutiny.

## VI. *Shackling*

Just prior to selecting the jury that would sentence Elledge, the state trial judge announced that a law enforcement official had informed the judge of two matters relating to Elledge. First, while incarcerated, Elledge had stated that, "because he had nothing to lose," he intended to assault the courtroom bailiff. Second, the law enforcement official also had informed the judge that, while in jail, Elledge had become proficient at karate. Accordingly, the trial judge—acting on his own accord—ordered Elledge placed in leg irons for the duration of the sentencing phase.

Defense counsel objected to the shackling order; the trial judge overruled the objection. Elledge then asked if he could "say something" and the trial judge refused. Elledge was shackled and remained so for the duration of his sentencing trial.

There is a troublesome question as to whether the appearance in shackles of a defendant whom the jury has just convicted of a gruesome crime is so inherently prejudicial that he is thereby denied his constitutional right to a fair capital sentencing proceeding.

Initially, the prejudice perceived when a defendant is seen in shackles by the jury involves the presumption of innocence. The issue has usually arisen in the context of a determination of guilt or innocence. Courts focus upon the prejudicial impact restraints have on the defendant's presumption of innocence. *See, e.g., Allen v. Montgomery,* 728 F.2d 1409, 1413 (11th Cir.1984); *Collins v. State,* 164 Ga.App. 482, 297 S.E.2d 503, 505 (1982); *State v. Tolley,* 290 N.C. 349, 226 S.E.2d 353, 367 (1976). Were this the sole rationale which prohibits courtroom shackling, the defendant here would have no case. The jury knows he is not innocent. Having just convicted him of a crime that makes him a candidate for capital punishment, he is no longer entitled to a presumption of innocence.

Arguments could be made that the jury's view of such a convicted murderer would have no effect on the sentencing or, indeed, may benefit the defendant. A jury may be more inclined to give a life sentence if it feels a defendant can be securely confined, as evidenced by the shackles. Seeing that the defendant can be properly restrained, it is not necessary to give the death sentence in order to protect against future harm. On the other hand, a jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision.

With no definitive answer as to how the shackling at sentencing would affect the jury, it might be appropriate to consider the issue on a case-by-case basis and make a judicial evaluation as to the effect on the jury in each particular case. Much as we might be inclined to follow this path, it

---

**21.** We also note that the trial judge implicitly may have found Elledge *intended* to murder Strack when the judge found that the murder was committed to avoid arrest for rape. Such a factual finding, of course, would carry a presumption of correctness. *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 697–98, 88 L.Ed.2d 704, 717–18 (1986).

would not seem to be available if controlling precedents are faithfully followed. The problem is that the Supreme Court has not bottomed the prohibition against shackling on presumption of innocence alone. When a broader concern is brought into play, there seems to be no reason to restrict the principles to the guilt-innocence phase of the trial. The language of the Supreme Court and this court in opinions regarding shackling, gives full consideration to that broader concern.

The Supreme Court has characterized shackling as an "inherently prejudicial practice." *Holbrook v. Flynn*, 475 U.S. 560, ——, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525, 534 (1986).[22] "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). When shackling occurs, it must be subjected to "close judicial scrutiny," *Estelle v. Williams*, 425 U.S. 501, 503–04, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976), to determine if there was an "essential state interest" furthered, *Holbrook*, 475 U.S. at ——, 106 S.Ct. at 1345, 89 L.Ed.2d at 534, by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed. *Holbrook*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525; *Woodard v. Perrin*, 692 F.2d 220, 221 (1st Cir.1982); *Hardin v. Estelle*, 365 F.Supp. 39, 47 (U.D.Tex.), *aff'd on other grounds*, 484 F.2d 944 (5th Cir. 1973).

This Court has fully adopted the broad concerns reflected in the Supreme Court opinions. *Allen*, 728 F.2d at 1413–14; *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223–24 (11th Cir.1983), *cert. denied*, 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984).

Putting the case in the same posture as it would be had the shackling occurred at the guilt-innocence stage of the trial, it is apparent that resentencing is required. Before selecting the jury to sentence Elledge, the trial court suddenly announced that it had decided to shackle Elledge:

I received information from Chief Miro yesterday, the Chief of Detention for the Broward Sheriff's Office.

He told me he received information from two of the Lieutenants—one in the jail, and one in the Detective Division—that Mr. Elledge had become a karate expert, while in prison—apparently; and he was going to attack my Bailiff, either on the way to the courtroom or in the courtroom, today, because he had nothing to lose—he is now serving two life sentences, plus fifty years for rape; and he is facing a death penalty, or another life sentence, arising out of this situation; that he has been adjudged guilty of these particular crimes.

In an abundance of precaution, I entered an Order to leave Mr. Elledge in leg irons here in these proceedings.

MR. McCAIN: For the record, the defense would object to it, in the presence of the jury, having the belief it would unduly influence and prejudice the jury against the defendant.

THE COURT: Fine. I think we ought to put it on the record.

THE DEFENDANT: May I say something, your Honor.

THE COURT: No sir. We will be in recess.

■ First, Elledge was denied the required procedure when the court refused him an adequate opportunity to challenge the untested information that served as the basis for the shackling. Under the decided case law, the court should have given the defense a reasonable opportunity to meet the surprise information or at the very least should have allowed Elledge the opportunity to speak with his attorney, who

---

**22.** Nothing in *Holbrook* indicates that the Supreme Court did not intend its ruling to apply to the penalty phase of a capital case; furthermore, it is unreasonable to believe that the court made its rule in *Holbrook* unaware that capital case trials are bifurcated. We think *Holbrook* means what it says.

then could have possibly made a more specific argument. *Zygadlo v. Wainwright,* 720 F.2d at 1223–24 (noting that due process may require an evidentiary hearing if the factual basis for security procedures was in dispute); *State v. Moen,* 94 Idaho 477, 491 P.2d 858, 860–61 (1971) (defendant should be afforded a reasonable opportunity to meet the information); *Tolley,* 226 S.E.2d at 368 (evidentiary hearing is required). Moreover, in *Bowers v. Maryland,* 306 Md. 120, 507 A.2d 1072, 1078–81, *cert. denied,* —— U.S. ——, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), the only case that squarely addresses shackling at the capital sentencing stage, the State's highest court found no error with the shackling after the defendant was given an opportunity to contest the necessity of shackling.

The record does not show whether Elledge was going to admit these allegations, contest them as false, or provide rebuttal evidence to indicate that he was behaving well as a prisoner, the last option recently recognized as mitigating evidence which must be considered by the sentencer. *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Only with an adversary process can the reliable evidence be sorted out from the unreliable. Future dangerousness can be determined only "when the convicted felon has the opportunity to present his own side of the case." *Barefoot v. Estelle,* 463 U.S. 880, 901, 103 S.Ct. 3383, 3398, 77 L.Ed.2d 1090 (1983).

The second problem with the shackling decision is that the State at no time made any showing that the shackling was necessary to further an essential state interest. Needless to say, the security and safety of a state's courtrooms is an essential state interest. *Holbrook,* 475 U.S. at ——, 106 S.Ct. at 1345, 89 L.Ed.2d at 534. There is no indication that the trial court considered alternative restraints, as the court is required to do. *Id.* at —— – ——, 106 S.Ct. at 1342–44, at 530–32; *Woodard,* 692 F.2d at 221; *Hardin,* 365 F.Supp. at 47. Safeguards deemed necessary by other courts dealing with the issue are absent in Elledge's case. The trial court never

"polled the jurors to determine whether any of them would be prejudiced by the fact that the defendant was under restraints." *Woodard,* 692 F.2d at 222. *See also Bowers,* 507 A.2d at 1081 (*voir dire* adequate to screen out one juror who indicated shackling would influence him). The trial court also gave no specific cautionary instruction. *See, e.g., Billups v. Garrison,* 718 F.2d 665, 668 (4th Cir.1983); *Commonwealth v. Brown,* 364 Mass. 471, 305 N.E.2d 830, 834 (Mass.1973).

Since these matters could not now be satisfactorily determined by an evidentiary hearing in federal district court after the passage of ten years since sentencing, it is quite appropriate that a writ of habeas corpus issue as to the capital sentence, with the State to have the right to conduct a constitutional sentencing procedure.

*Conclusion*

The district court's judgment is VACATED and the case is REMANDED to the district court with directions to issue the writ of habeas corpus setting aside the sentence of death in the absence of a new sentencing trial.

EDMONDSON, Circuit Judge, concurring in part and dissenting in part:

Although I am unwilling to concur in the court's judgment, I concur in its opinion except that part of the opinion concerning shackling of persons already found to be guilty of serious violent crimes.

The court holds that Elledge is entitled to a new sentencing hearing because the majority feels that shackling Elledge without first holding a hearing violated Elledge's constitutional right to a fair trial. I believe that the per se rule the court adopts today represents an extension of the law unrequired by the Constitution or binding precedent. I therefore respectfully dissent.

Before examining the law in this area, it is important to remember the situation in which this shackling occurred. Elledge had confessed to and pled guilty to the violent, brutal murder of Margaret Strack. Moreover, by the time he faced sentencing for the Strack murder, Elledge also had been convicted of a second murder that he

committed during an armed robbery some two days after he killed Strack. *See Elledge v. Florida,* 346 So.2d 998, 999–1000, 1001 (Fla.1977). In other words, Elledge was not a person who, in a fit of passion, had committed one aberrant killing in an otherwise exemplary life. The state trial judge declared, on the record, that he had received information from law enforcement officials that, while in prison, Elledge had vowed that because "he had nothing to lose" he intended to assault the courtroom bailiff while at sentencing. Moreover, the judge stated that he had been informed that, while in prison, Elledge had become proficient at karate. After stating this information on the record, the judge ordered the prisoner's legs shackled. Although an objection was made to the shackling, the defense did not request a hearing,[1] nor did the defense contest the factual accuracy of the judge's statements,[2] request curative instructions or suggest alternative, less restrictive means of restraint.

The court says that in such a situation the state trial judge violates the Constitution unless he holds a hearing before restraining the already-convicted defendant. In other words, the court today creates what seems to be a per se rule that requires a state trial judge always to hold a hearing before shackling a defendant at the sentencing phase of a bifurcated trial—even when no hearing is requested. I can-

not agree that the Constitution requires this.

Three major points refute the court's position. First, this case is not controlled by precedent because no federal court has addressed the constitutional impact of shackling at *sentencing.* All of the cases decided by federal courts involve courtroom security restraints of an accused at the *guilt-innocence* stage of trial. The primary constitutional concern at the guilt-innocence phase—fear that the restraint will interfere with the defendant's presumption of innocence—is not present here; the absence of this pivotal concern renders the guilt-innocence phase cases inapposite to sentencing phase shackling. Second, even when an accused's presumption of innocence is directly impacted—i.e., when the accused is restrained at the guilt-innocence stage— federal appellate courts have not reversed a trial judge's exercise of discretion in imposing restraint. Third, we are reviewing a state court proceeding; therefore, we examine this case solely for constitutional error and not under our powers of supervision. That is, our personal views of how the state trial judge *ought* to have acted are irrelevant, as is whether we would require, in our supervisory capacity, a federal trial court to have acted differently.

The court says that we are bound by precedent to reach the result it reaches.[3] I

---

1. Although the court apparently places great weight on Elledge's question—i.e., "May I say something"—it is unwilling to categorize this question as a request for a hearing. I agree that this question cannot be viewed as a hearing request. Elledge was neither pro se nor co-counsel pro se. In such a setting the trial judge is justified in listening solely to the defense's representative—in this case, the lawyer. In fact, the trial judge may be required to listen solely to the defense's representative. *See generally State v. Tait,* 387 So.2d 338, 339–40 (Fla.1980); *Thompson v. State,* 194 So.2d 649, 650–51 (Fla. Dist.Ct.App.1967). Needless to say, there may have been several tactical reasons why defense counsel did not actually want his client to be heard regarding this supposed attack on the bailiff. For example, defendant's story may have buttressed rather than undercut the view that defendant was dangerous or counsel may have feared that defendant would perjure himself. *See generally Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986) (counsel's duty of advocacy and loyalty is limit-

ed to lawful conduct; counsel cannot take steps that aid presentation of false evidence).

2. The defense has never denied the factual accuracy of the assault claim in any subsequent stage of Elledge's proceedings.

3. For example, the majority states that a reversal is required if "controlling precedents are faithfully followed." *Supra,* at 1451. Moreover, the court contends that *Holbrook's* holding definitively answered the shackling question once and for all: "Nothing in *Holbrook* indicates that the Supreme Court did not intend its ruling to apply to the penalty phase of a capital case"; and "it is unreasonable to believe that the Court made its rule in *Holbrook* unaware that capital case trials are bifurcated". *Id.* at 1451, n. 22.

A case is only authority for what it actually decides. *Holbrook* is not a shackling case; in fact, the Court only briefly mentions shackling in passing. It also is significant that *Holbrook* involves guilt-innocence phase security mea-

must stress, however, that this is a case of first impression. Neither the United States Supreme Court, nor any federal circuit court of appeals has addressed the constitutional impact—if any—of physical restraints imposed on a convicted murderer at the sentencing stage of a bifurcated state trial. Instead, the case law concerns shackling at the guilt-innocence stage of trial. The distinction between the two settings is crucial because the single major analytic thrust of all the guilt-innocence phase cases is to determine whether the defendant's right to a presumption of innocence[4] was infringed by the security measure adopted by the trial court.[5]

Elledge is unentitled to a presumption of innocence; once that overriding concern is eliminated from the evaluation, our analysis must be different. The guilt-innocence stage cases are materially different in three respects. When the defendant's right to a presumption of innocence is not present the defendant's constitutional interest in remaining unshackled is severely reduced. Moreover, the court is notified that courtroom security is at issue. Finally, in such a setting a juror's view toward the shackles is substantially altered because the shackles are expected. Cases involving the guilt-innocence phase shackling of defense witnesses provide an apt illustration of these significant differences.

On occasion, courts have ordered a defendant's witnesses shackled when those witnesses are inmates in maximum security prisons. Shackling an inmate witness is analogous to shackling a defendant at the sentencing phase and reflects the three differences mentioned above.

First, the decision to shackle an inmate witness is similar because such a witness, as a convicted felon, has no right to a presumption of innocence. See Harrell v. Israel, 672 F.2d 632, 637 (7th Cir.1982) ("Presumably, a person confined in a maximum security institution has committed at least one serious breach of the law. With respect to that offense, he is not presumed innocent.")

Second, courts facing this issue in the inmate-as-witness setting have recognized that one's status as a convicted felon raises the presumption that the inmate is dangerous; phrased differently, it places the trial court on notice that courtroom security is at risk. "Should such a [convicted felon] ... harbor any thoughts of escape, revenge or violence, the courtroom would provide the most obvious opportunity to act on them. Less intrusive measures may have an even more detrimental impact on the jury than shackles." Id. See United States v. Fountain, 768 F.2d 790, 794 (7th Cir.) (decision to shackle witnesses was prudent given fact that most witnesses were murderers), amended in part on other grounds, 777 F.2d 345 (7th Cir.1985), cert. denied sub nom. Silverstein v. United States, —— U.S. ——, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986), cert. denied sub nom. Gometz v. United States, ——

sures; the Court emphasizes throughout its opinion that its concern is whether the security measure somehow infringed the accused's right to a presumption of innocence. As a last point, I believe it also is relevant that the defendants in Holbrook were merely charged with robbery. In stark contrast, Elledge had been convicted of not one, but two, brutal murders when he appeared for his sentencing. See Elledge v. Florida, 346 So.2d 998, 1001 (Fla.1977) ("[Elledge] had at the time of the [first Strack trial] been convicted of the Nelson murder.")

4. While not specifically set forth in the Constitution, the precept that a defendant is presumed innocent by the American justice system until proven innocent has been deemed a critical part of the right to a fair trial. See Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

5. I agree that courts addressing the issue of courtroom restraints on occasion have mentioned other factors—e.g., restraints are somewhat of an affront to courtroom decorum, shackling may confuse the defendant—than possible impact on the presumption of innocence. None of those cases imply in any way, however, that the other factors would be sufficient, if standing alone, to violate the Constitution. Nor do they imply that the analysis would be identical if the presumption of innocence was not at risk. In fact, even in those cases in which other factors are mentioned, the critical issue emphasized by all of those courts is whether the security measure might interfere with the defendant's right to a presumption of innocence.

U.S. ——, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). The same is true whenever any person convicted of a violent felony appears before the court.

Shackling an inmate witness is similar to sentencing phase shackling for a third reason: the jurors view the shackles differently and are likely less prejudiced by the shackles. "The prejudice caused by shackling was mitigated by the jury's awareness that the entire *dramatis personae* in the two cases were prison inmates—most of them murderers—and guards. *The shackles could not have come as a surprise.*" *Id.* (emphasis added). *See generally Wilson v. McCarthy,* 770 F.2d 1482, 1485 (9th Cir.1985) (shackling of witness was justified by security concerns consisting of witness's prisoner status, seriousness of witness's prior conviction and that case involved prison gang). This analysis recognizes the common sense proposition that most citizens would not be surprised at—and probably would endorse—the practice of physically restraining felons convicted of violent crimes when those felons are removed from the controlled environment of their penal institutions. The Supreme Court acknowledged this practical, "common human experience" reality in *Holbrook* when it noted that four uniformed troopers in the courtroom "are unlikely to have been taken [by the jury] as a sign of anything other than a normal official concern for the safety and order of the proceedings. *Indeed, any juror who for some other reason believed defendants particularly dangerous might well have won-*

*dered why [more extensive security precautions were not in effect.]*" *Holbrook,* 475 U.S. at ——, 106 S.Ct. at 1347, 89 L.Ed.2d at 536 (emphasis added). The jurors in Elledge's case certainly had "some other reason"—i.e., other than the shackles—to believe Elledge was dangerous; many might have wondered why the state did not impose additional restraints given Elledge's homicidal past.

*Holbrook* indicates that in deciding whether a particular security measure is inherently prejudicial courts must rely on "reason, principle, and common human experience." *Id.* at ——, 106 S.Ct. at 1346, 89 L.Ed.2d at 535 (quoting *Estelle v. Williams,* 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)). *Fountain, Harrell* and *Wilson* all illustrate by analogy that shackling at the sentencing phase raises different concerns than guilt-innocence phase shackling and is not inherently prejudicial. The court admits as much when it notes that there is "no definitive answer as to how the shackling at sentencing would affect the jury." *Supra,* at 1451.[6] Thus, reason, principle and common human experience demonstrate that sentencing phase shackling cannot be inherently prejudicial.

Significantly, even when the presumption of innocence is directly at risk—i.e., when an accused is shackled at the guilt-innocence stage of trial—the federal courts of appeal and United States Supreme Court have refused to interject their view of what trial courts *ought* to do. Decisions con-

---

**6.** In fact, shackling may help a murderer avoid the death penalty; some empirical evidence exists that supports such a view. In a poll released on January 12, 1987 by the Associated Press, 86 percent of the people polled stated that they supported the death penalty. Significantly, the number one justification cited for the death penalty—given by 42 percent of its supporters—was "to protect society from future crime that person might commit." That is, many people who support the death penalty view it as a means, albeit an extreme one, to ensure that the criminal will not commit the same kind of crime in the future. Shackles are an outward sign that the criminal is securely controlled and demonstrates that the state can and will prevent the prisoner from being able to commit violent crimes again.

This information is not meant to prove that shackles in fact aided Elledge. Instead, I believe this kind of data demonstrates that we do not know how a sentencing juror reacts when he sees that a felon convicted of a violent murder is shackled. I therefore agree with the court's statement that "there is no definitive answer" as to whether shackles are prejudicial. This seems to me to lead to the inexorable conclusion that it cannot be inherently prejudicial to shackle a defendant at the sentencing phase of his trial. Because this court has no more reason to believe that such shackling is prejudicial than to believe that it is not, this court should not hold that sentencing phase shackling is inherently prejudicial. Certainly, I am unwilling to presume prejudice.

cerning courtroom security are accorded broad discretion. Simply put, the amount of security required in a particular courtroom, for a particular felon, in a particular community on a particular day is a highly intuitive decision that must be based on experience, common sense and sensitivity to all the circumstances of the moment. Obviously, the trial judge is the best person to make such decisions; reviewing courts consequently reverse only for abuse of discretion. *See Wilson v. McCarthy,* 770 F.2d 1482, 1484 (9th Cir.1985); *Harrell v. Israel,* 672 F.2d 632, 636 (7th Cir.1982); *Payne v. Smith,* 667 F.2d 541, 544 (6th Cir.1981); *Passman v. Blackburn,* 652 F.2d 559, 568 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982).

A survey of the case law concerning the use of shackles and other security measures at the guilt-innocence phase demonstrates my point. The court has not cited, nor have I found, a single case in which either a United States Circuit Court of Appeals or the United States Supreme Court has overturned a trial judge's decision to employ courtroom security measures even at the *guilt-innocence* phase. That is, even when the security procedure strikes at the bedrock precept that an accused is presumed innocent until proven guilty, courts have been loath to interfere with the trial court's use of discretion in the area of security-related decisions. It is counterintuitive to reach a different result when the fundamental concern is not present.

Moreover, not only should we generally defer to a trial court's discretion in courtroom-security decisions, our scope of review is severely restricted. Our task "is not to determine whether it might have been feasible for the State to have employed less [intrusive] security measures in the courtroom." *Holbrook,* 475 U.S. at ——, 106 S.Ct. at 1347–48, 89 L.Ed.2d at 536. Although if we were exercising our supervisory capacity "we might express a preference" that less intrusive measures be adopted, "we are much more constrained when reviewing a constitutional challenge

to a state court proceeding." *Id.* at ——, 106 S.Ct. at 1348, 89 L.Ed.2d at 536–37. It is important for us to remember that "all a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Id.* at ——, 106 S.Ct. at 1348, 89 L.Ed.2d at 537.

Therefore, it is irrelevant, for constitutional review purposes, whether the state trial judge considered less intrusive alternative restraints or did not issue, sua sponte, curative instructions. *See Wilson v. McCarthy,* 770 F.2d 1482, 1485 & n. 3 (9th Cir.1985) (while it "may have been the better course" for court to issue curative instruction, court of appeals "decline[d] to impose upon the trial court the mandatory responsibility of giving such an instruction."); *Woodard v. Perrin,* 692 F.2d 220, 221 (1st Cir.1982) ("a judge *should* consider less restrictive measures before deciding to shackle a defendant") (emphasis added). It may have been the better course to consider less restrictive alternatives, issue sua sponte curative instructions or conduct a sua sponte hearing. What we may view as the better course, however, is not always *required* by the Constitution. *See Holbrook,* 475 U.S. at ——, 106 S.Ct. at 1347–48, 89 L.Ed.2d at 536–37.

In summary, I believe that today's court has overstepped the proper boundary between federal and state courts and has extended case law that is fundamentally inapposite to the situation this case presents. When the pivotal issue of presumption of innocence is lacking, the defendant's constitutional rights are significantly less. Treating unconvicted persons the same as convicted persons grossly trivializes the rights of persons not convicted of crimes. Shackling can look harsh; and I personally would not impose it lightly. Nevertheless, under the facts as presented here, shackling Elledge did not deprive him of his constitutional right to a fair trial.[7]

---

**7.** Because we need only decide whether the steps taken in this case violated Elledge's constitutional rights, it suffices here to conclude that

in this particular setting—i.e., when (1) a state trial judge, (2) shackles the defendant for specific, articulable reasons, in addition to the defend-

We are unjustified in placing yet another aspect of state trial practice under the heavy-handed superintendence of the federal courts. The court today vests convicted felons with a new federal constitutional right; that is, the right to appear in court unfettered unless a hearing is held first and the evidence at the hearing shows us that shackling was truly essential.[8] The restriction on the powers of state courts has not been shown to be imperative to assure the fundamental fairness of sentencing proceedings. I do not believe appellant is entitled to a new sentencing hearing because he was shackled; therefore, I would affirm the district court's denial of the petition for a writ of habeas corpus.

ant's status as a felon convicted of a violent murder, (3) enters those reasons in the record, (4) the defense does not request a hearing, (5) the defense does not request curative instructions, and (6) the defense does not suggest less intrusive restraints—shackling the defendant at the sentencing phase of a state murder trial at which the death penalty is sought does not offend the Constitution. I emphasize that I do not intimate that any of these elements is necessary or that the absence of one or more of them would affect my view. I also do not preclude the possibility that, as a matter of constitutional law, the trial judge could, without holding a hearing, have the defendant physically restrained at the sentencing phase of a bifurcated state trial solely on the basis of the defendant's status as a violent felon. Although I agree that it is normally a good practice to hold a hearing before restraining defendants or witnesses, I do not think that the Constitution requires a hearing in all circumstances.

8. Federal courts are "forever adding new stories to the temple of constitutional law, and the temples have a way of collapsing when one story too many is added." *Douglas v. Jeannette,* 319 U.S. 157, 181, 63 S.Ct. 877, 889, 87 L.Ed. 1324 (1943) (Jackson, J., concurring in part and dissenting in part) (quoted in *Miranda v. Arizona,* 384 U.S. 436, 526, 86 S.Ct. 1602, 1654–55, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting)). I would not add to the temple in these circumstances.